UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                      No. 24-CR-88-DHU

NATHAN WARNER,

    Defendant.

## MEMORANDUM OPINION AND ORDER
## ON MOTION TO SUPPRESS

This matter is before the Court on Defendant's Motion to Suppress Evidence (Doc. 36). The Government filed its response (Doc. 43), and Defendant replied (Doc. 48). The Court held an evidentiary hearing on the Motion on June 24, 2025 ("Motion Hearing"). Defendant subsequently filed a supplemental brief (Doc. 53), to which the Government responded (Doc. 54).

Having considered the briefs, record evidence, hearing testimony, arguments, relevant law, and being otherwise fully informed, the Court concludes that Defendant's Motion to Suppress Evidence (Doc. 36) must be **GRANTED**.

## I.
## BACKGROUND

On December 11, 2023, the Los Lunas Police Department ("LLPD") received a call for service at the Big 5 Sporting Goods store in reference to a suspicious male who had entered the store. June 24, 2025, Motion Hearing Transcript ("Mot. Hr'g Tr.") at 6:8-18.[1] Sergeant Anthony Romero of the LLPD testified at the Motion Hearing that the caller advised that this suspicious

---

[1] This Memorandum Opinion and Order cites to the court reporter's unofficial transcript of the Motion Hearing as "Mot. Hr'g Tr. at page:line(s)." Page citations are subject to change on the official, edited version of the transcript.

male "waited for all of the customers to leave before going inside." Mot. Hr'g Tr. at 6:18-19. According to Sergeant Romero, the caller advised dispatch that "it appeared he possibly had a taser on his person and they were calling us to go check it out." *Id.* at 6:19-22.

At approximately 8:58 p.m. Sergeant Romero and another officer responded to the store. *Id*. at 7:8-23. It was dark outside. *Id*. at 7:24-25. As Sergeant Romero approached the store, he saw employees inside the store. *Id.* at 8:3-11. They appeared scared and the door was locked. *Id.* at 8-11. Sergeant Romero asked the employees where the suspicious person was located, and the employees pointed behind Sergeant Romero at a truck in the parking lot. *Id.* at 8:16-21, 9:3-9. Sergeant Romero confirmed with the employees which truck they were referring to, *id.* at 9:11-12, though it was the only vehicle that Sergeant Romero saw in the parking lot. *Id.* at 8:22-25.

Sergeant Romero and his colleague, Officer Gonzalez, then began approaching the truck. *Id.* at 9:18:20; 36:23-37:2. One of the officers pointed his flashlight into the truck through the front windshield. Romero LC at 0:25.[2] Sergeant Romero exclaimed to his partner, "fucking rifles." Romero LC at 0:26; *see also* Mot. Hr'g Tr. 37:15-20. Officer Gonzalez testified that he saw an "AR type rifle next to the center console and also a knife." Mot. Hr'g Tr. at 37:5-7. At this point both officers drew their firearms and held them at the "low ready" position. *Id.* at 46:19-23. Officer Gonzalez testified that "low ready" meant that the firearms were pointed "in the direction of the truck, but, still, not directly at the male." *Id.* at 38:21-39:6.

One of the officers began issuing orders: "put your hands on the dash." Romero LC at 0:30. The officer repeated, "put your hands on the dash." *Id.* at 0:32. One of the officers ordered, "don't

---

[2] Sergeant Romero's lapel camera video recorded the relevant encounter between Defendant and the two officers. The video is 2 minutes and 51 seconds long. Citations to this lapel camera recording are "Romero LC," followed by minute:seconds as displayed on the video recording.

get out!" *Id.* at 0:34. He then said, "hey, put your hands up!" *Id.* at 0:37. He repeated, "put your hands up! Put your fucking hands up!" *Id.* at 0:38-0:42. Sergeant Romero then walked around the back of the truck and the video shows a man standing outside the driver side door with his hands in the air while Sergeant Romero ordered, "Stay still! Put your hands up!" *Id.* at 0:42-0:45. The officers both shouted at the man not to reach for anything. *Id.* at 0:48. Sergeant Romero was pointing his firearm at the man. *Id.* Sergeant Romero then walked toward the man and Officer Rodriguez. *Id.* The man asked what was going on. *Id.* at 0:52. One of the officers told him, "just don't reach for nothing. Hey, let me detain you and then we'll talk. How does that sound? I see the weapons in there, just let me detain you." *Id.* at 0:53-1:03. The man responded, "none of it is mine." *Id.* One of the officers said, "do me a favor, turn around." *Id.* at 1:06. The man told him, "I can't move my arms very much." *Id.* The officer again ordered him to turn around. *Id.*

As the officers were detaining the man, he made comments about explosives being in the vehicle. *Id.* at 1:15-1:35. Sergeant Romero commanded, "put a cuff on his hand right now." *Id.* at 1:35. After placing the man in handcuffs, the officers searched him and found 10.1 ounces of methamphetamine in his jacket pocket, 5 blue pills in his pants pocket, and 30 Suboxone strips. Doc. 36 at 2. They also found a .22 caliber revolver in his breast pocket. *Id.* After Defendant was secured, the officers contacted dispatch with the license plate information on the truck and learned that it had been reported stolen. Mot. Hr'g Tr. 43:11-16. Officers also learned that there were numerous warrants for Defendant's arrest. *Id.* at 43:8-10.

On January 23, 2024, Defendant was indicted on two counts of felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and (924), one count of possession with intent to distribute 50 grams and more of a mixture and substance containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii), and one count of

using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Doc. 2). On February 1, 2024, Defendant pleaded not guilty to all charges (Doc. 16). On May 29, 2024, the government filed a superseding indictment (Doc. 24). Defendant was arraigned on June 5, 2024, and again entered a plea of not guilty to all four counts (Doc. 27).

In Defendant's Motion to Suppress, he argues, in summary, that he was seized by the LLPD officers without reasonable suspicion. Doc. 36 at 3. Therefore, the search of his person was unlawful, and all evidence obtained from the search, including the statements he made, are tainted by the unlawful seizure and must be suppressed. *Id.* at 3-7.

The Government opposes suppression. *See* Doc. 43. The Government seems to argue it was only a seizure under the Fourth Amendment once officers placed Defendant in handcuffs and performed a pat-down search. Doc. 43 at 4. The Government goes on to argue that the officers had reasonable suspicion to seize Defendant, and so the seizure was justified. *Id.* at 6-7. Finally, the Government asserts that even if the officers did not have reasonable suspicion, the seizure was still lawful because, it argues, the Tenth Circuit has authorized officers to "employ precautionary measures of force in a *Terry* stop when they reasonably believe they are necessary for their protection." *Id.* at 8 (citing *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994)). The Government contends that, "The officers' actions were constitutional and in accord with their community caretaking and investigative roles; their seizure of Defendant based on reasonable suspicion and to separate him from his weapons was proper for their own protection and the protection of others." Doc. 43 at 10. Bearing these arguments in mind, the Court will now summarize the relevant legal standards before turning to its analysis of the issues presented here.

## II.
## LEGAL STANDARDS

The Fourth Amendment guarantees a person's right to be free from "unreasonable searches and seizures." U.S. CONST. amend. IV. The exclusionary rule prohibits introduction of evidence directly obtained by a violation of the Fourth Amendment and evidence that is "the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see also Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of [Fourth Amendment] invasions.").

A defendant may move to suppress evidence that is "fruit of the poisonous tree." *See Wong Sun*, 371 U.S. at 488. To prevail, a defendant must first "demonstrate that his Fourth Amendment Rights were violated." *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006), *cert. denied*, 550 U.S. 949 (2007). Then, he must show "a factual nexus between the illegality and the challenged evidence." *Id.* (citation omitted). "In order for a defendant to meet his burden of showing a factual nexus, he must, [a]t a minimum . . . adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light *but for* the government's unconstitutional conduct [directed toward that complaining defendant]." *United States v. Ladeaux*, 454 F.3d 1107, 1111 (10th Cir. 2006) (alterations in original; citation omitted).

Once a defendant makes these showings, the government must "prove that the evidence sought to be suppressed is not fruit of the poisonous tree." *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014) (internal quotation marks and citation omitted). "When a motion to suppress involves a warrantless search, 'the government has the burden of proving its warrantless actions

were justified.'" *United States v. Jacobo-Rosas*, 625 F. Supp. 3d 1174, 1188 (D.N.M. 2022) (quoting *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020)).

In presiding over a motion to suppress, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *Goebel*, 959 F.3d at 1265.

## III.
## DISCUSSION

### A. The Seizure of Defendant by LLPD.

Defendant argues he was seized when the officers approached the vehicle, drew their firearms, and ordered him out of the truck, and he complied by stepping out of the vehicle and raising his hands. Doc. 36 at 4. The Government argues Defendant was seized when officers placed him in handcuffs and performed a pat down search, Doc. 43 at 5, but the Government does not appear to agree that Defendant was seized before that, when the officers held their firearms in the low-ready position and issued commands. *See* Mot. Hr'g Tr. at 63:1-13.

To assess whether a seizure complies with Fourth Amendment requirements,

> courts have identified three categories of police-citizen encounters: (1) consensual encounters . . . (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity . . . and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) (internal quotation marks and citation omitted). The Fourth Amendment is not implicated when an encounter between a citizen and the police is consensual. *See United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990). The touchstone of a consensual encounter is whether a reasonable person would feel free to walk

away from the encounter. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In other words, a seizure occurs "when the officer, by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks and citation omitted). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Id.* The determination of whether a seizure has occurred turns on "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). If a reasonable person would believe he is not free to leave, the encounter constitutes a seizure for purposes of the Fourth Amendment. *Id.*

The Court finds that Defendant was seized when the LLPD officers drew their firearms, ordered him out of the truck, and he began to comply by stepping out of the vehicle and raising his hands. The Court is not persuaded by the Government's suggestion that Defendant was not seized because the officers' firearms were at the low ready, rather than pointed directly at him. *See* Mot. Hr'g Tr. at 62:25-63:13. The Court agrees with Defendant that a seizure occurs when there is a show of authority and a citizen submits to that authority. *See* Mot. Hr'g Tr. at 76:16-77:13. The officers were in uniform, ordering Defendant to exit his vehicle and put his hands up, with their firearms pointed in his direction, and Defendant ultimately complied. There is no question that a reasonable person would not have felt free to leave or terminate the encounter under these circumstances. Because the Court has found that Defendant was seized at this point, the next question is whether the seizure was lawful.

**B. Whether the Seizure Adhered to the Fourth Amendment.**

Defendant argues the officers lacked reasonable suspicion when they seized him, and therefore the seizure and subsequent search was unlawful. Doc. 36 at 5. Specifically, Defendant asserts that LLPD officers were responding to a call about a suspicious person who might have a Taser, and it is not illegal to possess a Taser in New Mexico. *Id.* Therefore, officers had no information that would lead them to believe he had committed a crime:

> Their decisions to draw guns, command him to submit, and then search his person were all made without reasonable suspicion. At this point, neither officer had asked him any questions or conducted any investigation. The *only* fact the officers were aware of was they were responding to a suspicious person that might have a Taser. Based on these facts, there was no objective basis to believe Mr. Warner had committed any crime. Any other conclusion inevitably leads to a finding that the officers had a legal basis to detain any other person in the parking lot as well as the surrounding area.

*Id.*

In response, the Government argues the officers had reasonable suspicion to conduct an investigate detention pursuant to *Terry v. Ohio*, 392 U.S. 1, 16 (1968). Doc. 43 at 6. In support of its argument, the Government summarizes the facts surrounding the encounter and relieves heavily on the idea that *Terry* "instructs that law enforcement's actions in seizing an individual without probable cause be viewed through a lens of reasonableness." Doc. 43 at 7. During oral argument, the Court asked the Government to clarify what crime the officers suspected he was engaged in, and the Government ultimately stated that at the time of the encounter, "at that point, there is [no crime suspected], they are investigating at that point. And as the case law is very clear, that they are allowed to do…" Mot. Hr'g Tr. at 67:4-11. The Government then pointed to *United States v. King*, 990 F.2d 1552 (10th Cir. 1993), a case in which the Tenth Circuit found that an officer was

justified in separating a defendant from his firearm, though the officer's actions of ordering the defendant to his knees and pointing a firearm at the defendant went too far. Mot. Hr'g Tr. at 67:15-25; *see also* Doc. 43 at 9-10. The Government argues that reasonable suspicion was not required to seize Defendant here because the officers were permitted to take reasonable precautions for their own safety. *Id.* at 8 (citing to *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994). The Government relies on *Melendez-Garcia* for the idea that the Tenth Circuit has "held that officers are permitted to employ precautionary measures of force in a *Terry* stop when they reasonably believe they are necessary for their protection." *Id.* And the Government relies on *King* for the idea that the officers' community caretaking roles gave them authority to act as they did. Doc. 43 at 10.

After carefully considering the arguments, law, and record, the Court finds that the seizure violated the Fourth Amendment. First, the officers did not have reasonable suspicion that criminal activity was afoot. The Government itself conceded that they did not suspect a crime, but instead that they were merely investigating. But the law is clear: "investigative detentions are Fourth Amendment seizures of limited scope and duration and *must be supported by a reasonable suspicion of criminal activity*." *Shareef*, 100 F.3d at 1500 (emphasis added). "[O]fficers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Lambert*, 46 F.3d 1064, 1069 (10th Cir. 1995) (internal quotations and citations omitted). The record is devoid of facts that the officers had a particularized and objective basis for suspecting Defendant of criminal activity. It is not enough that they received a call about a suspicious person who may have had a Taser and had a firearm in his vehicle; they could identify no crime which they suspected Defendant of committing.

Furthermore, the officers' community caretaking duties and safety concerns related to the firearm cannot justify the seizure as the Government argues. "[P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' " *King*, 990 F.2d at 1560 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973)). But as the Court stated in *King*, "while the safety of police officers is no doubt an important government interest, it can only justify a Fourth Amendment intrusion into a person's liberty '[s]o long as the officer is entitled to make a forcible stop....' " 990 F.2d at 1558. That is, the stop has to be otherwise permitted under *Terry*, as the *King* court explained:

> In [*Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977*)*], the defendant was lawfully detained due to an expired license plate, and the de minimus intrusion in the interest of the officers' safety was reasonable partly because the police already had a basis to detain the individual. *Mimms*, 434 U.S. at 109, 98 S.Ct. at 332. *See also New York v. Class*, 475 U.S. 106, 117–18, 106 S.Ct. 960, 968, 89 L.Ed.2d 81 (1986) (de minimus intrusion reasonable partly because probable cause had focused suspicion on the affected individual). The government's argument would extend *Mimms* to allow police officers to seize any citizen whom the officers have any articulable reason to believe presents a threat to their safety. In a state such as New Mexico, which permits persons to lawfully carry firearms, the government's argument would effectively eliminate Fourth Amendment protections for lawfully armed persons. Moreover, the government's "reasonableness" standard would render toothless the additional requirement that the scope and duration of detention be carefully tailored to its underlying justification. *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325; *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. For example, if a police officer's safety could justify the detention of an otherwise lawfully armed person, the detention could last indefinitely because a lawfully armed person would perpetually present a threat to the safety of the officer.

*King*, 990 F.2d at 1558-1559.

Beyond this, it is worth quoting at length from the *King* opinion's discussion of the proper framework for analyzing stops made for community caretaking reasons given both parties' reliance on the case:

> In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity. *See, e.g., United States v. Rideau,* 949 F.2d 718, 720 (5th Cir.1991) (officers stopped defendant for his own safety and the safety of others after observing him standing in the middle of the road at night, dressed in dark clothes, and apparently intoxicated), *vacated on other grounds,* 969 F.2d 1572 (5th Cir.1992) (en banc) (agreeing with panel on this point); *United States v. Wallace,* 889 F.2d 580, 582 (5th Cir.1989) (officers detained defendant for his own safety after being informed that he possessed gun and had threatened suicide), *cert. denied,* 497 U.S. 1006, 110 S.Ct. 3243, 111 L.Ed.2d 753 (1990). The fact that the officer may not suspect the individual of criminal activity does not render such a seizure unreasonable per se as *Terry* only requires "specific and articulable facts which ... reasonably warrant [an] intrusion" into the individual's liberty. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. *See also Rideau,* 969 F.2d at 1574; *Wallace,* 889 F.2d at 582. *Cf. State v. Vistuba,* 251 Kan. 821, 840 P.2d 511, 514 (1992) (safety reasons based on specific, articulable facts may justify vehicle stop)…
>
> However, a person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for "[i]t is surely anomalous to say that the individual ... [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara,* 387 U.S. at 530, 87 S.Ct. at 1731 (footnote omitted). Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference.

*King*, 990 F.2d at 1560.

Critically, here the LLPD officers did *not* approach Defendant in their noninvestigatory role. They were not exercising their community caretaking function like the officer in *King*, who approached a defendant during the course of her investigation of a vehicle accident and the defendant was honking incessantly. Here, the LLPD officers were responding to a call about a suspicious person. As the Government agreed at the hearing, they were *investigating* Defendant based on the 911 call about his behavior. *See* Mot. Hr'g Tr. at 67:8-11. Therefore, the Court finds that the framework from *King* regarding community caretaking and noninvestigatory seizures is inapplicable. Given this, and because the Court found that the encounter was also not supported by reasonable suspicion, the Court must find that the LLPD officers' seizure of Defendant violated the Fourth Amendment.

### C. Whether Suppression is Warranted.

Lastly, Defendant moves to suppress the firearms, methamphetamine, and his own statements to officers because, he argues, they are fruits of the unlawful government action. Doc. 36 at 6-7. He argues all of the evidence obtained from him is tainted by the unlawful seizure and must be suppressed. *Id.*

In response, the Government first argues that the gun should not be suppressed because the Motion to Suppress,

> does not and cannot argue that Defendant was seized once the officers shined their flashlights into the truck. Instead, it asserts that the seizure occurred when Defendant was not "free to leave" once he was "told to raise his hands and place them on the dash." But Defendant was told to raise his hands and keep them in view <u>because</u> the officers had seen the AR style rifle and the knife through the truck's windows. The rifle cannot be "fruit of the poisonous tree" because it was discovered without any seizure.

Doc. 43 at 12. The Government also argues that "[a]t a minimum, it was reasonable and appropriate for the officers to separate Defendant from the rifle and knife within his reach before talking to him, and also to pat him down given the presence of the visible weapons and the report of another weapon (the Taser the caller believed she saw)." *Id.* at 12. The pistol and narcotics were found in the pat down. Additionally, even before the pat-down, Defendant made statements about a bomb, which were probable cause to arrest him. Finally, the truck Defendant was in was stolen, which "officers learned after they radioed dispatch with the license plate information, and which would have been its own probable cause for arrest, even if Defendant had never left the vehicle." *Id.*

In addition, Defendant initially conceded in his reply to his Motion to Suppress that "if this Court finds the officers discovered the AR style rifle before the unlawful seizure it would not be subject to suppression." Doc. 48 at 5. However, at the hearing, Defendant withdrew this concession, Mot. Hr'g Tr. at 59:14-60:1, and both parties submitted supplemental briefs addressing the AR style rifle (Docs. 53 and 54). Defendant now argues the AR style rifle is a fruit of the poisonous tree because:

> both officers testified that they would not have seized the rifle but for the arrest of Mr. Warner. They both agreed that it is not illegal to possess a rifle in a car in New Mexico… The officers were not aware that the rifle was evidence of a crime until after they seized Mr. Warner unlawfully. This is different from a scenario where officers see contraband in plain view. In that circumstance, they are immediately aware that the item is evidence of a crime. In this case, it was only after the unlawful seizure.

Doc. 53 at 2.

The Government argues that suppression of the AR style rifle is not warranted because the officers had reasonable suspicion to "detain Defendant and separate him from the rifle next to him in the truck." Doc. 54 at 6. The Government relies again on *King* to support its argument that the officers were permitted to separate Defendant from the rifle, and it argues "[w]hether the weapon

13

possessed by a defendant is possessed illegally 'has no bearing on the reasonableness of [the officer's] actions because the interest justifying' separating a defendant from a weapon 'is [the officer's] safety, and a legally possessed weapon presents just as great danger … as an illegal one.' " *Id.* (quoting *King,* 990 F.2d at 1561). Lastly, "even without their reasonable suspicion, the discovery of the rifle and other evidence was inevitable as the officers would have learned that the truck was stolen once they ran the license plate." This is because:

> At the evidentiary hearing, the Los Lunas officers explained that it was part of their regular investigative practice to run license plate information through dispatch, and that they had done so in this case after Defendant was handcuffed. They also testified that they learned after detaining Defendant that there was a warrant for his arrest and that the truck in which he sat had been reported stolen. Even if Defendant had not gotten out of the truck. or if he had tried to leave as officers approached, the officers would have been able to lawfully view the truck's license plate number and learn that it was stolen, which would have given the officers not just reasonable suspicion, but probable cause to stop the vehicle and arrest Defendant on the active warrant.

Doc. 54 at 7.

Here, regarding the pistol, methamphetamine, and Defendant's statements, the Court finds that this evidence must be suppressed. All of these items would not have come to light but for the unconstitutional seizure and subsequent search of Defendant. Because the Court has found the seizure of Defendant was unlawful, and all of these items were seized directly as a result of the seizure, this evidence is tainted and must be suppressed.

Regarding the AR style rifle, the Court agrees with Defendant that it also must be suppressed. As Defendant argues, the key fact here is not that the rifle was visible through the vehicle's window, but that the officers did not know that the rifle was evidence of a crime until *after* they unlawfully seized him. They both agreed that a person with a firearm in their vehicle in New Mexico is not violating the law based on that possession alone. *See* Mot. Hr'g Tr. at 23:18-

14

24:4; 46:12-18. In essence, they would not have seized it but for subsequent events and their arrest of Defendant. Therefore, the Court finds that the AR style rifle is also fruit of the poisonous tree and suppression is warranted.

Finally, the Court finds that the Government has not met its burden to prove by a preponderance of the evidence that the police would have inevitably discovered the evidence at issue in this case without the Fourth Amendment violation. "Under [the inevitable-discovery] doctrine, the exclusionary rule does not apply if the government can prove by a preponderance that the evidence inevitably would have been discovered by lawful means." *United States v. Braxton,* 61 F.4th 830, 833 (10th Cir. 2023) (internal quotation marks and citations omitted). It is the government's burden to prove by a preponderance of the evidence that the evidence in question "would have been discovered without the Fourth Amendment violation." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005).

The Court is not convinced by the Government's inevitable discovery argument that all of the evidence would have been discovered as soon as officers received information from the truck's license plate and discovered that the truck was reported stolen. Though the Government asserts that the officers testified it was part of their regular practice to run license plate information through dispatch, and that they did so in this case after Defendant was handcuffed; that they learned there was a warrant for Defendant's arrest after detaining him; and that even if Defendant fled they would have run the license plate and discovered it was stolen, and then would have arrested him on his active warrant, this is not enough to show that they would have found all of the evidence at issue. The Government's request to apply the inevitable discovery doctrine is based on speculative assumptions of inevitably, which is insufficient for the exception to apply. *See United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003) ("In determining whether the government has met its

burden of proof, we consider 'demonstrated historical facts,' not 'speculative elements.'") (quoting *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)); *accord United States v. Owens*, 782 F.2d 146, 153 (10th Cir. 1986) ("[T]he inevitable discovery exception to the exclusionary rule cannot be invoked because of [a] highly speculative assumption of 'inevitability.'"). It is not clear to the Court by a preponderance of the evidence that the officers would have found all of the evidence sought to be suppressed without the Fourth Amendment violation. Therefore, all of the evidence will be suppressed.

## IV.
## CONCLUSION

For all of the reasons stated above, the Court will suppress the physical evidence obtained and Defendant's statements. Based on the facts determined by the Court, the officers did not have reasonable suspicion to seize Defendant, nor did they have any other lawful basis to do so. The Government has failed to meet its burden to show that of the seizure was justified. The Court also concludes that, but for the unlawful conduct described herein, the contraband in Defendant's vehicle and his statements would not have been discovered. Pursuant to the exclusionary rule of the Fourth Amendment, the evidence discovered as a result of the search must thus be excluded.

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Suppress Evidence (Doc. 36).

**IT IS SO ORDERED.**

_____
DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE